# In the United States Court of Federal Claims

No. 11-573C
(Filed Under Seal: December 1, 2011)
(Reissued for Publication: December 20, 2011)[*]

```
*************************************
ORION TECHNOLOGY, INC.,          *
                                 *
            Plaintiff,           *
                                 *
 v.                              *
                                 *
THE UNITED STATES,               *
                                 *
            Defendant,           *
                                 *
and                              *
                                 *
STRATEGIC RESOURCES, INC.,       *
                                 *
            Defendant-Intervenor.*
*************************************
```

Preaward Bid Protest; Motion to Dismiss;
Cross-Motions for Judgment on the
Administrative Record; Noncompliant
Proposal; Missing Teaming Partner Cost/
Price Data; Exclusion From Competition
After Initial Screening of Proposals;
Standing; Section L Versus Section M of
the Solicitation; Procuring Agency
Discretion

Charles Cervantes, Arlington, VA, for plaintiff.

Elizabeth A. Speck, United States Department of Justice, Washington, DC, for defendant.

Paul E. Pompeo, Washington, DC, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this preaward bid protest, plaintiff Orion Technology, Inc. claims that it was improperly excluded from a competition for contracts to perform support services at various United States Army ("Army") installations. Plaintiff further contends that its proposal should have been reinstated to the competition after the Army amended the solicitation to announce its plan to hold discussions. Defendant moves to dismiss plaintiff's protest on standing grounds, and both plaintiff and defendant move for judgment on the administrative record. For the reasons set forth below, the court finds that plaintiff lacks standing to protest. Thus, the court

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on December 16, 2011. Redactions are indicated with a bracketed ellipsis ("[. . .]").

grants defendant's motion to dismiss, finds as moot defendant's motion for judgment on the administrative record, and denies plaintiff's motion for judgment on the administrative record.

## I. BACKGROUND

### A. The Solicitation

On December 7, 2010, the Army's Mission and Installation Contracting Command issued solicitation number W9124J-11-R-0001, a negotiated procurement of support services for various Army installations.[1]  AR 131-33.  The services to be acquired were described in a Performance Work Statement ("PWS").[2]  Id. at 132.  The competition, which remains ongoing, is set aside for small businesses, id., and will result in the award of multiple indefinite-delivery, indefinite-quantity task order contracts, id. at 207, 225.  The Army anticipates awarding six to eight contracts to those offerors representing the best value to the government.  Id. at 225.

#### 1. Section L

In section L of the solicitation, the Army set forth its proposal preparation instructions. See generally id. at 208-24.  In these instructions, the Army advised offerors of its intent to award contracts without conducting discussions, but reserved the right to hold discussions if necessary. Id. at 209.  It accordingly encouraged offerors to include their best offer in their initial proposals. Id.

The Army's instructions also included multiple warnings regarding the importance of compliance with the solicitation's requirements.  For example, the Army cautioned: "Noncompliance with the Request for Proposal (RFP) requirements may hamper the Government's ability to properly evaluate the proposal and may result in elimination of the proposal from further consideration for contract award."  Id.  It also advised: "Offerors are required to meet all solicitation requirements, such as terms and conditions, representations and certifications, and technical requirements, in addition to those identified as evaluation factors or

---

[1]  The court derives the facts in the background section from the administrative record ("AR").  Although the administrative record was supplemented with an affidavit from the contracting officer before this protest was reassigned to the undersigned, reference to the affidavit was unnecessary for the court's decision.

[2]  The PWS was not included in the administrative record.  The record does include, however, the Army's acquisition plan, which indicated that the Army intended to procure services in support of its mobilization, demobilization, deployment, redeployment, and restationing of its active duty and reserve personnel.  AR 46.  The Army grouped these support services into twelve task areas for inclusion in the PWS: plans, training, mobilization, security, human resources, finance, material management and supply, services, movements, equipment readiness and maintenance, billeting and facilities, and information management.  Id.

subfactors (Sections A through M).  Failure to meet a requirement may result in an offer being ineligible for award." Id. at 213; cf. id. at 131 (noting, on the solicitation's cover page, i.e., Standard Form ("SF") 33, that "[a]ll offers are subject to all terms and conditions contained in this solicitation").

With respect to the proposals' contents, the Army instructed offerors to submit their proposals in four separate volumes: General, Mission Capability, Past Performance, and Cost/Price.  Id. at 210.  The Cost/Price volume was to be organized in several sections.  Id. at 221.  One section was to include "evidence of an adequate accounting system as determined by the [Defense Contract Audit Agency]." Id. at 222.  The Army noted that an adequate accounting system was "a regulatory requirement with a pass/fail determination" and that failure to have such a system might make an offeror ineligible "to receive a cost type award." Id.

In other sections of the Cost/Price volume, the Army required the submission of a proposal for a supplied task order scenario.  Id. at 221.  The Army directed offerors to submit a "fully completed and error free" task order pricing schedule containing their "prices for the established Contract Line Item Numbers (CLINS) . . . for the Phase-In, base year, all options years and Phase-Out." Id. at 222.  Offerors were to then provide a cost/price proposal to support the pricing schedule.  Id.  In the narrative portion of their cost/price proposal, offerors were to explain how they derived all of their costs, including labor, other direct costs ("ODCs"), and indirect costs, as well as how any teaming partners derived their costs.  Id.  In the second portion of their cost/price proposal, offerors were to provide the data used in their price/cost calculations. Id. at 223.  For example, their ODCs were to be "submitted in total and as separate proposed amounts, and annotated as to the PWS paragraph the cost element support[ed]." Id.  In addition, offerors were to submit a direct labor table containing detailed information about the labor rates for each proposed labor category, including the labor hours, wage rate, fringe benefits amount, general and administrative costs, and fee.  Id.  The Army warned:

> The prime contractor is responsible to enter its teaming partner(s) pricing.  If a teaming partner does not want to reveal proprietary information to the prime offeror, the Government will accept a direct submission of the pricing spreadsheets from the teaming partner(s) in order to protect its proprietary information.  Teaming partner(s) pricing information is required to facilitate future adjustments based on changes to the Department of Labor (DOL) Wage Determination. . . . Prime contractors are responsible for conducting price analyses to establish reasonableness of proposed teaming partner(s) prices, and to include the results of these analyses in the pricing narrative.  It is also the responsibility of prime contractors to ensure their teaming partner's pricing proposal is submitted by the closing date/time.  Proposals received that do not contain complete pricing for both the prime and all teaming partner(s) may not be considered for award.

Id.  All of the cost/price data submitted by offerors was "required to determine [whether] the proposed price [was] fair and reasonable."  Id. at 221.

## 2.  Section M

In section M of the solicitation, the Army described how it intended to evaluate the offerors' proposals.  See generally id. at 225-31.  It identified three evaluation factors: Mission Capability, Past Performance, and Cost/Price.  Id. at 226.  The Mission Capability factor had five subfactors: Response to Scenario, Management Approach, Staffing and Training Approach, Quality Approach, and Technical Expertise.  Id.  The Response to Scenario subfactor was "significantly more important than the other subfactors," which were "of equal importance."  Id.  The Mission Capability factor was "significantly more important" than the Past Performance factor, and these two factors combined were "approximately equal to" the Cost/Price factor.  Id.  The Army noted, however, that "the degree of importance of cost/price as a factor in determining award could become greater depending upon the equality of the proposals evaluated in the non-cost/price factors."  Id. at 225.

For each factor and subfactor, the Army described the criteria it would use to evaluate the offerors' proposals.  Id. at 226-31.  With respect to the Cost/Price factor, the Army provided:

> The Cost/Price Factor will not be scored or rated.  The task order scenario cost/price proposal will be evaluated for price reasonableness and cost realism. For the cost proposals, the Government will evaluate the realism of the offeror's proposed costs in relation to the offeror's response to Mission Capability Subfactor 1A "Response to Scenario."  Cost will be evaluated to assess the degree to which proposed costs accurately reflect proposed performance.  Cost realism analysis will be performed in accordance with [Federal Acquisition Regulation ("FAR")] 15.404-1(d)(2).
>
> The Government will evaluate offers for award purposes by adding the total cost for all options to the total cost for the basic requirement (to include phase-in).  Evaluation of options shall not obligate the Government to exercise the option(s).

Id. at 231.  The Army described a possible effect of unreasonable prices:  "Proposed prices evaluated as unreasonable may be grounds for eliminating a proposal from competition."  Id. at 225.  It also described a possible effect of unrealistic prices: "Unrealistically low costs/prices may be grounds for eliminating a proposal from competition on the basis that the offeror has demonstrated a lack of understanding of the requirement."  Id.

Overall, the Army advised offerors that after performing its trade-off analysis, it would award contracts to offerors providing the best value to the government:

> Contract(s) may be awarded to the offeror who is deemed responsible in accordance with the FAR, as supplemented, whose proposal conforms to the solicitation's requirements (to include all stated terms, conditions, representations, certifications, and all other information required by Section L of this solicitation) and is judged by an overall assessment of the evaluation factors and subfactors to represent the most advantageous to the Government.

Id.  The due date for proposals was February 8, 2011.  Id. at 131, 208.  Offerors were warned that late proposals would not be accepted.[3]  Id. at 131, 207.

## B.  Plaintiff's Proposal

Plaintiff submitted a proposal to the Army on February 8, 2011, along with at least [. . .] other companies.  Id. at 333-923, 1112.  In its proposal, plaintiff "agree[d] with all terms, conditions, and provisions of the solicitation," as amended, "without exception."[4]  Id. at 334.

In the Cost/Price volume of its proposal, plaintiff included, among other things, a task order pricing schedule containing its prices for each established contract line item number, id. at 816-61, a worksheet identifying its ODCs, along with their associated contract line item numbers and PWS paragraphs, for each year of the contract, id. at 784-815, 923.1-.2, and a direct labor table for each year of the contract, id. at 816-61, 1220-45.  In the direct labor tables, plaintiff included complete data for those positions that it would fill itself, but for the positions that would be filled by its teaming partners, it provided only the total proposed cost for each position.  Id.  In other words, for the teaming partner positions, the tables did not include certain required data such as the hourly wage rates, fringe benefit amounts, or general and administrative costs.  Id.

---

[3]  The FAR provision referenced in the solicitation sets forth three exceptions to this rule, but none of those exceptions is relevant to this protest.  See FAR 52.215-1(c)(3)(ii)(A).

[4]  Nevertheless, plaintiff apparently did not agree with the solicitation's provision regarding how long offers were to remain open.  In section L, the Army provided: "Unless the offeror inserts a different time on the SF 33, the proposal will remain valid for a period of 180 days from the date of receipt specified" for proposals.  AR 209.  In the section of the SF 33 that must be completed by each offeror is the following provision: "[T]he undersigned agrees, if this offer is accepted within _____ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule."  Id. at 131.  Plaintiff did not fill in the blank in the SF 33 it submitted with its proposal, id. at 343, and it affirmatively stated in its proposal's cover letter that it would "hold the prices in its offer firm for 30 calendar days from the date specified for receipt of offers, unless another time period is specified in an addendum to the solicitation," id. at 336.  The Army did not, however, cite the expiration of plaintiff's offer as a reason for rejecting plaintiff's proposal.  See id. at 1100-01.

Overall, plaintiff identified eleven teaming partners in its proposal. Id. at 338-39. Eight of these teaming partners were identified in plaintiff's Cost/Price volume as supplying labor for the task order scenario. Id. at 886. Of these eight teaming partners, three submitted their proprietary pricing information directly to the Army by the proposal deadline. Id. at 924-1098. However, the Army did not receive pricing information for the five remaining teaming partners by the proposal deadline, either from plaintiff or the teaming partners themselves.[5] Id. at 1126. Twenty percent of the proposed cost of the task order was to be borne by one of these five teaming partners, and all five teaming partners were responsible for just over thirty percent of the proposed cost. Id.

Plaintiff eventually realized that it had failed to submit with its proposal five sealed envelopes containing its teaming partners' proprietary pricing information. Id. at 1133-34. When it discovered its oversight, plaintiff sent the envelopes to the Army via Federal Express. Id. The Army received the Federal Express packages on February 16, 2011, and ultimately returned them to plaintiff, unopened, on March 25, 2011. Id. at 1125.

In the meantime, the Army conducted an initial screening of the submitted proposals, as provided in the Source Selection Plan. Id. at 86. In that document, the Army indicated that the procuring contracting officer, in conjunction with the Source Selection Evaluation Board, would "verify that each proposal [met] the requirements of the solicitation" in four areas: "sufficiency in cost data," "special provisions," "certifications," and "terms and conditions of the solicitation." Id.

In an April 8, 2011 letter, the Army informed plaintiff that its offer would not be evaluated or further considered for award because it did not comply with the solicitation's requirements. Id. at 1100. The Army provided the following reasons for excluding plaintiff's proposal from the competition:

a. Your proposal failed to provide required cost/price information for your teaming partners in accordance with (IAW) Section L . . . . Five teaming partners, including one that is proposing over 20% of the total cost of the requirement, failed to submit cost/price information to the Government. Further, for the teaming partners that did provide cost information, there were some inconsistencies between what the teaming partners indicated they proposed and what you, as the Prime, brought forward in your cost/price proposal. Without these submissions, the proposed productive hours, labor mix, and direct labor rates cannot be verified and evaluated. Consequently, your cost/price proposal cannot be evaluated for price reasonableness and cost realism IAW Section M . . . .

---

[5] Although one of these five teaming partners submitted to the Army information regarding its financial capability and its bid price, it failed to supply its proprietary pricing information. AR 1125, 1129-31.

b. Your proposal provided substantiation supporting $584,029.86 of other direct costs (ODCs) in compliance with Section L, . . . but your proposal failed to allocate any of these ODCs to the individual contract line item numbers (CLINs). Further, the cost/price worksheet's summing calculations were erroneous and indicated a false total of just $216,799.80. Consequently, your ODCs cannot be evaluated for cost realism IAW Section M . . . .

Id. In the internal documentation describing these deficiencies, the Army noted a third area in which plaintiff's proposal did not comply with the solicitation's requirements: plaintiff did not provide proof that it possessed an adequate accounting system or request an accounting system review. Id. at 1099. There is no evidence in the administrative record that plaintiff was notified of this deficiency or that the Army considered it a reason to exclude plaintiff from the competition. Ultimately, it appears that at least [. . .] offerors were excluded from the competition in the screening process prior to the Army's evaluation of proposals. See id. at 1112 (containing a table listing all offerors that had their proposed costs evaluated, each identified by letter, but omitting offerors that might have been identified by the letters [. . .], and [. . .]).

### C. Plaintiff's Protests

On April 11, 2011, plaintiff filed an agency-level protest of its exclusion from the competition. Id. at 1102-08. The Army denied this protest on April 27, 2011. Id. at 1123-28. Plaintiff then filed a protest with the United States Government Accountability Office ("GAO") on May 5, 2011. Id. at 1132-46. On June 20, 2011, before the GAO decided plaintiff's protest, the Army issued Amendment 7 to the solicitation to, among other things, inform offerors that it had determined that discussions were necessary, that such discussions would be held with those offerors in the competitive range, and that it was incorporating a revised wage determination into the solicitation. Id. at 1155. Eight days later, plaintiff filed a second agency-level protest claiming that Amendment 7 negated the Army's rationale for excluding it from the competition and therefore required the Army to evaluate its proposal. Id. at 1188-94. Plaintiff provided the Army with additional information concerning its standing to assert its second agency-level protest on July 2, 2011. Id. at 1195-98.

The Army dismissed plaintiff's second protest for lack of standing on August 5, 2011, id. at 1199-1201, and the GAO denied plaintiff's protest on August 12, 2011, id. at 1202-08. Plaintiff then filed a second protest with the GAO raising its Amendment 7 arguments on August 14, 2011. Id. at 1210-17. The GAO dismissed this second protest for lack of standing on August 29, 2011. Id. at 1218-19.

Plaintiff filed its protest in the United States Court of Federal Claims ("Court of Federal Claims") on September 8, 2011, alleging three substantive claims for relief.[6]  First, it contends that the Army's failure to include plaintiff "in the pool of qualified offerors for evaluation of its proposal was without a rational basis[,] . . . arbitrary, capricious and otherwise not in accordance with law." Compl. ¶ 28.  Second, it asserts that the Army's refusal to evaluate plaintiff's proposal "under newly revised labor standards pursuant to Amendment 7 was without a rational basis, arbitrary, capricious and otherwise not in accordance with law." Id. ¶ 29.  Third, it claims that the Army's refusal to evaluate plaintiff's "revised cost/price proposal as it did for the other offerors" denied plaintiff the equal protection of the laws and violated FAR 1.102(b)(3) regarding fairness.  Id. ¶ 30.  Plaintiff seeks an injunction preventing the Army from further evaluating proposals unless the Army evaluates its proposal and engages it in discussions.

During a November 3, 2011 status conference, the court rendered an oral ruling on several outstanding motions to supplement the administrative record.  The court provided a written explanation of those rulings, and ruled on additional, later-filed motions to supplement the administrative record, on November 16, 2011.  Now before the court are defendant's motion to dismiss on standing grounds and plaintiff's and defendant's cross-motions for judgment on the administrative record.  The court heard argument on November 17, 2011, received postargument supplemental briefs that were requested by plaintiff, and is now prepared to rule.[7]

---

[6]  This protest was originally assigned to the Honorable Lawrence M. Baskir.  On October 27, 2011, Judge Baskir recused himself from the protest and the protest was reassigned to the undersigned.

[7]  Despite the court's prior ruling on the motions to supplement the administrative record, plaintiff's counsel reargued his complaints about the "wholeness" of the administrative record both during oral argument and in the supplemental brief he filed after oral argument.  During oral argument, immediately after the case was called and counsel identified themselves for the record, the court directed counsel for all parties to approach a table that had been placed in front of the bench.  On that table were three versions of the direct labor table spreadsheets submitted by plaintiff with its proposal.  The first version was originally included in the administrative record–it was printed on 8.5x11-inch paper and had been generated from Microsoft Excel files submitted by plaintiff with its proposal.  The second version was an enlarged copy of the spreadsheets–it was printed on 11x17-inch paper, generated from Microsoft Excel files submitted by plaintiff with its proposal, and added to the administrative record as a result of the court's prior ruling.  The third version was a duplicate copy of the paper spreadsheets submitted by plaintiff as part of its proposal–it was printed on 8.5x14-inch paper and provided to the court by plaintiff's counsel for in camera review.  The court directed plaintiff's counsel to compare, line by line, the three versions of the spreadsheets to confirm, as the court concluded in its prior ruling, that while the number of rows per page might differ among the versions, all three versions contained the same substantive data and were accurate representations of the spreadsheets submitted by plaintiff to the Army.  Plaintiff's counsel agreed on the record with the court's conclusions.  See Oral Arg. Nov. 17, 2011, at 2:23.09-.30, 2:26.09-.35.

## II.  DISCUSSION

Defendant first moves to dismiss plaintiff's protest for lack of standing.  In ruling on a motion to dismiss, the court generally assumes that the allegations in the complaint are true and construes those allegations in the plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, if the defendant challenges the factual basis of the court's jurisdiction, contested allegations in the complaint are not controlling.  Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993).  Rather, the plaintiff must come forward with a preponderance of evidence in support of its jurisdictional allegations.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936).  The court may therefore look to evidence outside of the pleadings to determine the existence of jurisdiction.  Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974).  If the court finds that it lacks jurisdiction over a claim, the court must dismiss it.  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

To the extent that plaintiff possesses standing to protest, plaintiff and defendant cross-move for judgment on the administrative record.  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)

---

Although plaintiff's counsel had just agreed, moments before, that the enlarged versions of the spreadsheets were accurate, he began his argument on the merits of plaintiff's motion for judgment on the administrative record by disputing the accuracy of the enlarged spreadsheets submitted by defendant and added to the administrative record by the court.  In fact, he spent considerable time "reading into the record" the data contained in the enlarged spreadsheets, even though the court and counsel had reviewed this same data and agreed that the data was included as part of the administrative record.  He also requested, and the court granted, permission to file a supplemental brief to address the impact that the supplementation of the administrative record with the enlarged spreadsheets had on plaintiff's merits arguments.  Indeed, in his supplemental brief, plaintiff's counsel reasserts his allegation that the spreadsheets in the administrative record are unacceptable substitutes for the original versions, describing the documents as "ersatz," "altered," "flawed," "non-existent," and "tortured 'knock-offs.'"  Pl.'s Supplemental Br. 1-2, 6.

By rearguing an issue during oral argument that he had already conceded and then renewing the identical baseless arguments in his supplemental brief, plaintiff's counsel teeters on the edge of a Rule 11 violation.  See R. U.S. Ct. Fed. Cl. 11(b).  The court has determined that the original and enlarged copies of the spreadsheets contained in the administrative record are accurate representations of the spreadsheets submitted by plaintiff with its proposal, and plaintiff's counsel has stated, on the record, his agreement with this conclusion.  Plaintiff's counsel's statements to the contrary are clear misrepresentations of these proceedings.

(citing <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[8]).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." <u>Bannum, Inc.</u>, 404 F.3d at 1356.

Plaintiff objects to two decisions made by the Army: the Army's exclusion of plaintiff from the competition prior to fully evaluating its proposal and the Army's failure to reinstate plaintiff to the competition after it issued Amendment 7 to the solicitation.

## A.  The Exclusion of Plaintiff From the Competition

### 1.  Plaintiff Lacks Standing to Challenge Its Exclusion From the Competition

As a threshold matter, defendant argues that plaintiff lacks standing to challenge its exclusion from the competition.  "[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975). The standing inquiry involves both Article III "case or controversy" limitations on federal jurisdiction and "prudential limitations on its exercise."[9]  <u>Id.</u>  The plaintiff bears the burden of establishing its standing to protest.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).

"The standing issue in this case is framed by 28 U.S.C. § 1491(b)(1), which . . . imposes more stringent standing requirements than Article III."  <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  Under section 1491(b)(1), bid protests may only be brought by "interested parties."  The term "interested party" is construed in accordance with the Competition in Contracting Act of 1984, and, accordingly, "standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  <u>Am. Fed'n of Gov't Emps. v. United States</u>,

---

[8]  The decision in <u>Bannum</u> was based upon what was then Rule 56.1 of the Rules of the United States Court of Federal Claims, which was abrogated and replaced by Rule 52.1.  Rule 52.1 was designed to incorporate the decision in <u>Bannum</u>.  <u>See</u> R. U.S. Ct. Fed. Cl. 52.1, Rules Committee Note (June 20, 2006).

[9]  Congress created the Court of Federal Claims under Article I of the United States Constitution.  28 U.S.C. § 171(a) (2006).  Courts established under Article I are not bound by the "case or controversy" requirement of Article III.  <u>Zevalkink v. Brown</u>, 102 F.3d 1236, 1243 (Fed. Cir. 1996).  However, the Court of Federal Claims and other Article I courts traditionally have applied the "case or controversy" justiciability doctrines in their cases for prudential reasons.  <u>See id.</u>; <u>CW Gov't Travel, Inc. v. United States</u>, 46 Fed. Cl. 554, 558 (2000); <u>see also</u> <u>Anderson v. United States</u>, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) ("The Court of Federal Claims . . . applies the same standing requirements enforced by other federal courts created under Article III.").

258 F.3d 1294, 1302 (Fed. Cir. 2001) (citing 31 U.S.C. § 3551(2)(A) (2000)); see also Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (interpreting this standard as requiring a protester to show that it was an interested party prejudiced by the procuring agency's action and holding that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"[10]); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (defining "prejudice" as "injury"). Therefore, plaintiff must establish that it "(1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006).

In this case, there is no dispute that plaintiff is an actual bidder. Thus, the first prong of the interested party test has been satisfied. With regard to the second prong, however, defendant contends that plaintiff does not possess the necessary direct economic interest that would be affected by award of the contract. The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has described two ways in which a protester may demonstrate the requisite direct economic interest, depending on the timing of the protest. In postaward bid protests, a protester must show that it had a "substantial chance" of receiving the contract. Id. at 1307. In other words, "[t]o have standing, the plaintiff need only establish that it 'could compete for the contract' . . . ." Myers Investigative & Sec. Servs., Inc., 275 F.3d at 1370 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1334 (Fed. Cir. 2001)). And, in at least some preaward bid protests, a protester must show "a 'non-trivial competitive injury which can be addressed by judicial relief.'" Weeks Marine, Inc., 575 F.3d at 1361-63 (quoting WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748 (1998)). Defendant argues that plaintiff's direct economic interest should be analyzed under the "substantial chance" test applied in postaward bid protests.[11] At oral argument, it explained that although this protest was

_____

[10] A protester must also demonstrate prejudice to succeed on the merits. See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it."). The test for demonstrating prejudice at both the standing and merits stages of the protest is the same, but application of the test may yield different results due to the differing standards of review. See L-3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011) ("The difference between the two [prejudice standards] is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."); Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings).").

[11] In its motion to dismiss, defendant only obliquely alludes to the fact, by way of a single citation, that the Federal Circuit has employed a different test in a preaward bid protest.

lodged before the Army awarded any contracts, the fact that offerors had already submitted proposals made this protest more analogous to a postaward protest for purposes of determining standing.

The key issue presented here is whether the test endorsed by the Federal Circuit in Weeks Marine, Inc.–a nontrivial competitive injury that can be addressed by judicial relief–applies in this preaward bid protest.  In Weeks Marine, Inc., the protester objected to the contract vehicle selected by the agency for a dredging procurement, and filed its protest before proposals were due.  See Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 23, 27-28 (2007) (indicating that the solicitation was issued on June 4, 2007, that the solicitation was amended ten times from June to September 2007, that the protest was filed on September 28, 2007, and that the agency agreed to extend the due date for proposals to November 1, 2007), aff'd in part, rev'd in part, 575 F.3d at 1352.  The Federal Circuit remarked:

> [W]here a prospective bidder/offeror is challenging a solicitation in the pre-award context[,] . . . it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award bid protest cases.  The reason of course is that, in a case such as this, there have been neither bids/offers, nor a contract award.  Hence, there is no factual foundation for a "but for" prejudice analysis.  However, Article III considerations require a party such as [the protester] to make a showing of some prejudice.

575 F.3d at 1361 (citation omitted).  It therefore held: "[I]n a pre-award protest such as the one before us, [a] prospective bidder or offeror must establish 'a non-trivial competitive injury which can be redressed by judicial relief' to meet the standing requirement of § 1491(b)(1)."  Id. at 1363.

There is a lack of unanimity in the Court of Federal Claims concerning whether the test endorsed in Weeks Marine, Inc. applies in all preaward bid protests, regardless of the stage of the procurement.  In most preaward bid protests decided after Weeks Marine, Inc. where standing was at issue, the court has analyzed a protester's direct economic interest under the Weeks Marine, Inc. test.[12]  In some cases the protest was filed before the deadline for proposals.  See,

---

Specifically, it cites three decisions from the Federal Circuit in postaward bid protests and one decision from the Court of Federal Claims in a preaward protest in support of the proposition that the proper test is the one applied in postaward bid protests.  The citation to the Court of Federal Claims decision that contains the oblique allusion reads, in its entirety: "CS-360, LLC v. United States, 94 Fed. Cl. 488, 495 n.6 (2010) (arguing that the 'substantial chance' test is more appropriate in pre-award cases in which bids have been submitted)."  Def.'s Mot. 15.

[12]  In Medical Development International, Inc. v. United States, the court discussed the Weeks Marine, Inc. test only with respect to the merits determination of prejudice.  89 Fed. Cl. 691, 700-02 (2009).  In that case, the protester "lodged its protest before the contract was

e.g., CW Gov't Travel, Inc. v. United States, No. 11-298C, 2011 WL 4363087 (Fed. Cl. Aug. 26, 2011) (applying the test in a challenge to certain terms in the solicitation); Jacobs Tech. Inc. v. United States, No. 11-180C, 2011 WL 2215018 (Fed. Cl. May 27, 2011) (applying the test in a challenge to a reprocurement that occurred as part of an agency's corrective action).  In other cases, the protester submitted a proposal but the procuring agency had not yet awarded a contract. See, e.g., ICP Nw., LLC v. United States, 98 Fed. Cl. 29 (2011) (applying the test where the protester submitted bids on seven solicitations and then challenged the terms of the solicitations); Camden Shipping Corp. v. United States, 89 Fed. Cl. 433 (2009) (applying the test where the protester submitted a timely proposal but was later eliminated from the competition after its offer had expired, and holding that had the protester "successfully proved the facts alleged, it would have suffered a non-trivial competitive injury resulting from a prejudicial error made by [the agency]").

In contrast to the decisions in which the court has applied the test endorsed in Weeks Marine, Inc., the court in CS-360, LLC suggested, albeit in dicta, that the Weeks Marine, Inc. test should not be applied in all preaward bid protests.[13]  94 Fed. Cl. at 495 n.6.  It distinguished the posture of the procurement in the protest before it–where the protester submitted an offer and was declared the lowest bidder–from the posture of the procurement in Weeks Marine, Inc., and

---

awarded, but after the competitive range had been determined," making it "distinguishable from both post-award protests and pre-award, solicitation-based protests, where the unsuccessful bidder [was] challenging an aspect of the procurement prior to the evaluation of the offers."  Id. at 701.  Although it did not specify which test it utilized for assessing the protester's direct economic interest, it held that the protester had established standing:

> If [the protester's] exclusion from the competitive range deprives it of pre-award standing to challenge the competitive range determination, the exclusion could have the frustrating result of depriving [the protester] completely of any possibility of judicial relief.  Even if [the protester's] exclusion from the competitive range could deprive it of standing to challenge a later award, it does not, in this court's view, deprive it of standing to make a pre-award challenge to the competitive range determination.

Id. at 701-02.

[13]  This sentiment was also briefly mentioned in another preaward bid protest: DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653 (2010).  Standing was not contested in that case, id. at 662, but in a footnote, the court remarked: "Weeks Marine offers an alternative formulation of bid protest standing applicable in a pre-award protest of the terms of a solicitation. Here, [the protester] is not challenging the terms of the solicitation, but the proposed award . . . ." Id. at 661 n.10 (citation omitted).  It therefore commented that "[t]he record shows that [the protester] had a substantial chance of winning the contract, but for the procurement errors alleged in the complaint."  Id. at 662.

concluded: "The traditional 'substantial chance' test . . . seems more appropriate given the facts of this case. The standard applied by the Federal Circuit in <u>Weeks Marine</u> is <u>sui generis</u> to that case." <u>Id.</u> Nevertheless, because the protester in its case was ineligible to participate in the procurement in the first instance,[14] <u>id.</u> at 500, the court recognized that its holding would be the same regardless of which test was used, <u>id.</u> at 495 n.6. Although the facts in <u>CS-360, LLC</u> are distinguishable from those in this case,[15] the court reaches the same conclusion: plaintiff lacks standing regardless of which test the court applies.

Plaintiff contends that the Army both could have, and should have, evaluated its cost/price proposal as submitted; in other words, that the cost/price data from five of its teaming partners omitted from its proposal was unnecessary for the Army's evaluation. Plaintiff's contention is premised upon its interpretation of section L of the solicitation, which, according to plaintiff, contains only guidelines for preparing and submitting proposals, and not proposal requirements. It therefore argues that teaming partner cost/price data was not a required part its proposal. Plaintiff's argument lacks merit.

As a preliminary matter, the court notes that although it is generally required to assume that allegations in a complaint are true and construe those allegations in the plaintiff's favor, it need not do so when jurisdiction is at issue. Here, plaintiff's allegation that its proposal was timely and complete because it "contained all the information necessary for the Agency to evaluate its proposed costs and prices," Compl. ¶ 6, and its allegation that section L of the solicitation contained "guidelines," not "requirements," <u>id.</u> ¶ 7, are central to the issue of plaintiff's standing. Thus, the court is entitled to look beyond the complaint to ascertain whether these allegations have a factual basis. As the court explains more fully below, the evidence in the administrative record and the relevant regulations belie plaintiff's allegations.

First, plaintiff's general contention that the provisions of section L of the solicitation are mere guidelines and not requirements is clearly contradicted by the plain language of the solicitation. The solicitation contained explicit language requiring offerors to comply with every

---

[14]  In <u>CS-360, LLC</u>, the solicitation required bidders to be included in a database of service-disabled veteran-owned small businesses prior to award. 94 Fed. Cl. at 493. And, applicable regulations provided that firms removed from the database were ineligible to bid on solicitations set aside for firms in the database. <u>Id.</u> at 499-500. The protester was removed from the database on April 30, 2010. <u>Id.</u> at 492. The solicitation was issued on May 17, 2010, and bids were due on June 17, 2010. <u>Id.</u> at 493. Although it was not in the database, the protester submitted a bid and was found to be the lowest bidder. <u>Id.</u> On June 29, 2010, the procuring agency rejected the protester's bid because the protester was not in the database. <u>Id.</u>

[15]  In <u>CS-360, LLC</u>, the protester was ineligible to compete for the contract in the first instance, while here, plaintiff was initially eligible to participate in the procurement. It was not until the Army screened the proposals it received in response to the solicitation that plaintiff was excluded from the competition.

section of the solicitation–in other words, sections A through M–including all terms, conditions, representations, certifications, and technical requirements.  AR 131, 209, 213, 225.  In fact, in section M–the section describing the evaluation factors for award–the Army noted that a successful proposal would conform to all of the solicitation's requirements, specifically including those set forth in section L.  Id. at 225.

Second, plaintiff's more specific assertion that the submission of detailed cost/price data for each teaming partner was not required is also contrary to the plain language of the solicitation.  The solicitation contained an unambiguous requirement that offerors either supply their teaming partners' price/cost data to the Army or ensure that the Army received the data directly from their teaming partners by the proposal deadline.  Id. at 223.  Moreover, the Army clearly indicated in the solicitation that it would use offerors' teaming partner cost/price data to perform a cost realism analysis.  Id. at 231; see also FAR 15.403-3(a)(1)(ii) (noting that an agency can "[r]equire submission of data . . . from the offeror to the extent necessary to determine a fair and reasonable price," including "data from an offeror to support a cost realism analysis").[16]  Plaintiff's attempt to cast the solicitation's language concerning teaming partner cost/price data as permissive rather than mandatory cannot succeed.

Plaintiff's reliance on decisions from the Comptroller General and the General Services Board of Contract Appeals ("GSBCA") cannot detract from the solicitation's plain language.[17]

––––––––––––––––––––

[16]  Other provisions in the FAR support the proposition that detailed cost/price data is used to perform a cost realism analysis.  See FAR 15.404-1(c)(1) ("Cost analysis is the review and evaluation of any separate cost elements and profit or fee in an offeror's or contractor's proposal, as needed to determine a fair and reasonable price or to determine cost realism, and the application of judgment to determine how well the proposed costs represent what the cost of the contract should be, assuming reasonable economy and efficiency." (emphasis added)); FAR 15.404-1(d)(1) ("Cost realism analysis is the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." (emphasis added)).

[17]  While the decisions of the Comptroller General and the boards of contract appeals are not binding on the Court of Federal Claims, their analyses may be instructive.  See Cutright v. United States, 953 F.2d 619, 622 n.* (Fed. Cir. 1992) ("This court does not consider Comptroller General decisions binding on the Claims Court."); Gen. Elec. Co., Aerospace Grp. v. United States, 929 F.2d 679, 682 (Fed. Cir. 1991) (stating that the decision of a board of contract appeals that was "confronted with the same issue" was not binding on the Court of Federal Claims or the Federal Circuit); see also Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) ("While not binding authority on this court, the decisions of the Comptroller General are instructive in the area of bid protests."); Bath Iron Works Corp. v. United States, 20 F.3d 1567,

In All Phase Environmental, Inc., the Comptroller General remarked that "rather than establishing minimum evaluation standards, the instructions of section L generally provide guidance to assist offerors in preparing and organizing proposals." B-292919.2 et al., 2004 CPD ¶ 62 (Comp. Gen. Feb. 4, 2004). There is no indication, however, that the solicitation at issue in that case contained the explicit language present in the solicitation here requiring offerors to comply with section L. Id. In Syntrex Inc., the protester contended that section L language indicating that proposed software be "described by giving the 'date of release for general use'" required that "all offered software must have been released for general use at the time for submission of proposals." GSBCA No. 8696-P, 87-1 BCA ¶ 19497. The GSBCA disagreed with the protester's interpretation of the quoted language, finding it "was merely an instruction regarding the format for proposals which required offerors to identify the release date for software," but the GSBCA did not hold that all section L language constituted instructions. Id. Thus, neither decision provides support for plaintiff's position.

Given the plain language of the solicitation, plaintiff cannot establish standing to protest under any standard. Under the "substantial chance" standard, plaintiff must show that it could compete for the contract but for the Army's alleged error in disqualifying its proposal. Plaintiff cannot make this showing because it failed to submit information–complete cost/price data for all of its teaming partners–clearly required in the solicitation, and plainly necessary for the Army to conduct a cost realism analysis. Acceptance of plaintiff's argument that complete cost/price data for all of its teaming partners was unnecessary to perform a cost realism analysis would be akin to shifting the burden of providing the information required for a cost realism analysis from plaintiff to the Army. If the burden shifted in that manner, the Army would be forced to examine a teaming partner's total proposed cost for a particular position and guess the amount of each component of that cost, such as the hourly wage rate, the fringe benefit amount, and the general and administrative cost. The Army, however, is not responsible for filling in missing data, much less filling in missing data with its own guesses. Because plaintiff failed to include critical information in its proposal, it had no chance, much less a substantial chance, of receiving a contract award.[18] Further, under the standard endorsed in Weeks Marine, Inc., plaintiff must demonstrate that it suffered a nontrivial competitive injury that is within the court's power to remedy. Plaintiff has not made this showing. Because it failed to submit all of the information the Army required to evaluate its proposal, as specified in the solicitation, plaintiff could not have been injured by the Army's failure to evaluate its proposal.

_____

1584 (Fed. Cir. 1994) (noting that a decision of a board of contract appeals was not binding on the Federal Circuit).

[18] Because plaintiff failed to submit information required by the Army to evaluate its proposal in the first instance, this case is factually distinct from Dyonyx, L.P. v. United States, 83 Fed. Cl. 460, 467 (2008). In Dyonyx, L.P., the procuring agency was able to evaluate the protester's proposal even though it contained information prohibited by the agency in the solicitation. Id. at 463-64. Here, the missing information precluded the Army's evaluation of plaintiff's proposal altogether.

In sum, regardless of which standard the court employs, plaintiff has not established that it has a direct economic interest in the competition.  Therefore, it is not an interested party. Accordingly, plaintiff lacks standing to assert its first claim for relief.

**2. Assuming Plaintiff Had Standing, the Army's Decision to Exclude Plaintiff From the Competition Had a Rational Basis**

Despite concluding that plaintiff lacks standing to protest the Army's exclusion of its proposal from the competition, the court finds utility in providing an alternative holding on the merits of plaintiff's first claim for relief.  In bid protests, the Court of Federal Claims reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  Centech Grp., Inc., 554 F.3d at 1037 (quoting Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332).  Here, plaintiff claims that the Army's exclusion of its proposal from the competition lacked a rational basis.

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332 (internal quotation marks omitted).  Thus, when a protester challenges the procuring agency's decision as irrational, the court's review is "highly deferential" to the agency's decision, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and "[t]he court is not empowered to substitute its judgment for that of the agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  Impresa Construzioni Geom. Domenico Garufi, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); accord Advanced Data Concepts, Inc., 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").

As noted above, plaintiff's challenge to its exclusion from the competition is based upon its contention that teaming partner cost/price data was not a required part of its proposal. Consequently, plaintiff asserts, the Army should have exercised its discretion and taken one of two actions: evaluated its proposal without the missing teaming partner cost/price data or evaluated its proposal after accepting the teaming partner cost/price data it submitted via Federal Express after the proposal deadline.

The court has already concluded that offerors in the procurement at issue were required to submit teaming partner cost/price data with their proposals.  Thus, without a valid premise, plaintiff's argument that the Army should have evaluated its proposal despite its failure to timely submit all of the required data disintegrates.  Moreover, even if the court disregarded the faulty premise, plaintiff's contention that the Army improperly exercised its discretion turns the concept of discretion on its head.  Agencies have broad discretion in how they conduct a procurement.  Thus, the Army's determination that a noncompliant proposal disqualified an offeror, such as plaintiff, from further participation in the competition is entitled to deference.  Furthermore, offerors were repeatedly warned in the solicitation that failure to comply with the solicitation's requirements might result in the Army excluding their proposals from the competition or declaring them ineligible for contract award.  AR 209, 213, 222.  Nevertheless, ignoring the deference due to the Army's decision and the plain language of the solicitation, plaintiff argues that the Army should have used its discretion not to disqualify its proposal, but to evaluate its incomplete, noncompliant proposal or accept its late-submitted teaming partner cost/price data and evaluate its proposal with that information included.  In essence, plaintiff seeks to substitute its own idea of how the Army should exercise its discretion for how the Army actually did exercise its discretion.  The court refuses to adopt plaintiff's approach.

Because plaintiff contends that the Army's exclusion of its proposal from the competition lacked a rational basis, the court's task is limited to determining whether the Army provided a coherent and reasonable explanation for its action.  The evidence in the administrative record provides ample support for the Army's decision to disqualify plaintiff.  In its letter informing plaintiff that it had been eliminated from the competition, the Army indicated that the disqualification was based on plaintiff's failure to supply cost/price data for all of its teaming partners, including one representing over twenty percent of plaintiff's proposed cost; inconsistencies with other teaming partners' cost/price data; plaintiff's failure to allocate ODCs to individual contract line numbers; and erroneous ODC calculations.  Id. at 1100-01.  These deficiencies, the Army stated, prevented it from being able to evaluate plaintiff's cost/price proposal for cost realism and price reasonableness pursuant to the evaluation criteria set forth in the solicitation.  Id.  Although plaintiff challenges the Army's conclusion that it was unable to evaluate plaintiff's proposal due to the lack of complete teaming partner cost/price data,[19] it fails

_____

[19] In its motion for judgment on the administrative record, plaintiff does not challenge the Army's conclusions regarding the ODCs.  At oral argument, however, plaintiff contended that it had submitted all of the required information in the worksheet identifying its ODCs.  And, in its supplemental brief, plaintiff argues that because the solicitation lacks any requirement that offerors allocate ODCs to individual contract line numbers, the Army's rejection of plaintiff's proposal on this basis violates statute and regulation.  Plaintiff's newly raised contentions address a single aspect of the Army's comments on plaintiff's ODCs–the purported failure to allocate the ODCs to individual contract line item numbers–and do not counter the Army's observation that "the cost/price worksheet's summing calculations were erroneous and indicated a false total of just $216,799.80" of ODCs.  AR 1100.  The court normally does not consider contentions first raised at oral argument or in a supplemental brief.  See SmithKline Beecham Corp. v. Apotex

to cite any evidence, statute, regulation, or case law that supports its position that the Army could evaluate its proposal for cost realism and price reasonableness in the absence of the data.[20] Instead, disregarding the plain language of the solicitation, plaintiff offers the bald statement that the omitted data was mere surplusage.  Unfounded statements fail to satisfy the heavy burden plaintiff bears to demonstrate that the Army's determination lacked a rational basis. Accordingly, the court concludes that the Army's explanation for its rejection of plaintiff's proposal was both coherent and reasonable.

Also coherent and reasonable was the Army's decision to return to plaintiff, unopened, the packages containing the cost/price data for plaintiff's teaming partners that plaintiff failed to submit with its original proposal.  The deadline for proposals was clearly stated in the solicitation, as was the warning that late proposals would not be considered.  Id. at 131 (citing FAR 52.215-1), 207-08.  The Army was under no obligation to accept or open late-submitted proposal materials.  See SafeGuard Servs., LLC, B-404910, 2011 CPD ¶ 132 (Comp. Gen. June 28, 2011) ("Portions of proposals that are submitted late may not be considered by the agency . . . ."); see also Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1381 (Fed. Cir. 2009) ("A late proposal is tantamount to no proposal at all.").  Indeed, had the Army accepted plaintiff's late submissions, the Army would have given plaintiff an unfair competitive advantage by bestowing a benefit–additional time to submit a complete proposal–exclusively on plaintiff. Moreover, the Army was not under an obligation to open discussions with plaintiff to obtain the missing teaming partner cost/price data once the Army discovered the omission.  See Day & Zimmerman Servs., a Div. of Day & Zimmerman, Inc. v. United States, 38 Fed. Cl. 591, 604

---

Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised on the opening brief are waived."); L-3 Commc'ns EOTech, Inc. v. United States, 87 Fed. Cl. 656, 659 n.2 (2009) ("Plaintiff must not be allowed to advance new legal theories at oral argument, prejudicing defendant.").  But if it did, it would conclude that plaintiff's contentions regarding the ODC data it submitted with its proposal, which concern only one of several bases for the Army's decision, are insufficient to meet its heavy burden of demonstrating that the Army's decision lacked a rational basis.

[20]  Indeed, the regulations and case law appear to support the contrary proposition.  See, e.g., FAR 15.404-1(c)(1); FAR 15.404-1(d)(1); Red River Holdings, LLC v. United States, 87 Fed. Cl. 768, 787 (2009) ("Proposals must be complete and conform to the Solicitation."); Int'l Res. Recovery, Inc. v. United States, 60 Fed. Cl. 1, 6 (2004) ("[I]t is well established that all offerors . . . are expected to demonstrate their capabilities in their proposals. . . .  Plaintiff's failure to submit a [mobilization] plan left a void in the information to be evaluated . . . ." (citations omitted)); Gordon R.A. Fishman, B-257634, B-247634.3, 95-2 CPD ¶ 217 (Comp. Gen. Nov. 9, 1995) ("An agency may not properly accept for award a proposal that fails to meet one or more material solicitation requirements."); Joint Venture Penauillie Italia S.p.A. et al., B-298865, B-298865.2, 2007 CPD ¶ 7 (Comp. Gen. Jan. 3, 2007) ("An offeror bears the burden of submitting an adequately written proposal that contains all information required under a solicitation.").

(1997) (noting that "a contracting agency retains discretion in determining whether or not to hold discussions in a particular procurement" except in "peculiar circumstances"); Jack Faucett Assocs., B-253329, 93-2 CPD ¶ 154 (Comp. Gen. Sept. 7, 1993) ("Even where individual deficiencies may be susceptible to correction though discussions, the aggregate of many such deficiencies may preclude an agency from making an intelligent evaluation, and the agency is not required to give the offeror an opportunity to rewrite its proposal."). The Army specified in the solicitation that it did not intend to hold discussions, AR 209, so plaintiff could not have had any expectation when it submitted its proposal that it would have the opportunity to rectify proposal deficiencies through discussions. And, if the Army chose to hold discussions, the discussions would, by regulation, occur after the establishment of a competitive range. FAR 15.306(d). Because plaintiff was eliminated from the competition well before the Army established a competitive range–indeed, it was excluded after an initial screening conducted before the Army evaluated proposals to ascertain whether discussions were necessary[21]–the Army could not engage it in discussions.[22]

In sum, contrary to plaintiff's contentions, the Army's decisions not to evaluate plaintiff's incomplete proposal and not to accept plaintiff's late submission of teaming partner cost/price

---

[21] Because the Army did not conduct a comprehensive evaluation of plaintiff's proposal, there is no basis for plaintiff's assertion that it belonged in the competitive range. Further, the court cannot, as plaintiff requests, direct the Army to place plaintiff in the competitive range because the court is not empowered to evaluate proposals in the first instance.

[22] Plaintiff contends that it was excluded from the competitive range, and cites several decisions in support of the proposition that it is improper to exclude an offeror from the competitive range without first evaluating its proposed cost/price. See, e.g., Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 115 (2006) ("Although the Government is correct in pointing out the breadth of discretion that a contracting officer is afforded in determining the competitive range, the [contracting officer] does not have discretion to ignore an evaluation factor that is set forth in the Solicitation when making the competitive range determination." (footnote omitted)); Meridian Mgmt. Corp., B-285127, 2000 CPD ¶ 121 (Comp. Gen. July 19, 2000) ("Cost or price to the government must be included in every RFP as an evaluation factor, and agencies must consider cost or price to the government in evaluating competitive proposals. This requirement means that an agency may not exclude a technically acceptable proposal from the competitive range without taking into account the relative cost of that proposal to the government." (citations omitted)). The Army, however, never evaluated plaintiff's proposal on its merits. Rather, it determined that the proposal did not comply with requirements set forth in the solicitation and therefore could not be evaluated. Thus, the proposition advocated by plaintiff is inapplicable to its situation.

data for use in evaluating plaintiff's proposal both had a rational basis, and therefore they were not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[23]

---

[23] In its response in opposition to defendant's motion for judgment on the administrative record, plaintiff suggests, without any support, that the Army, the Army's employees, and the United States Department of Justice have engaged in a conspiracy to prevent the award of a contract to plaintiff in the procurement at issue.  See, e.g., Pl.'s Resp. 8 ("This action, by the same agency, the same group of procurement officers and same agency counsel, strongly suggests retaliation for filing this bid protest."), 9 ("Defendant . . . opens the door for exploring the prospect of retaliation . . . . Plaintiff has retained other counsel to pursue a protest and may elect to bring those claims before this judicial body . . . .  It is the same agency, the same procurement officers, the same agency counsel and same parties . . .  in this lawsuit. Consolidating those claims with the instant case will reveal what is really going on with this group of procurement officials and their questionable conduct."), 14 ("It appears that . . . there was a group of agency procurement officials searching for a variety of ways to exclude Orion."). Specifically, plaintiff suggests that it was eliminated from the competition at issue here because it had received another, similar contract.  It bases this allegation on a footnote in defendant's cross-motion for judgment on the administrative record that mentions the Small Business Administration's decision not to issue a certificate of competency to plaintiff in that other procurement.  However, perhaps because it has no other evidence to offer, it frames its allegations as questions:

> Is the agency punishing success?  Did the agency feel it could manipulate the "system" to distribute wealth, notwithstanding the facts and the law?  Did the agency believe "it could get away with it", since this was a small minority business, already suffering cash-flow problems, already drained on legal fees and unable to fight the presumptions and burdens in favor of the federal government? Did the agency think that a small, minority owned, 8(a) business could fight the power of the Department of Justice in league with a big DC law firm?  When a small business challenges the authority and discretion of a group of procurement officials and their counsel, is it worth it to face retaliation in other procurement opportunities?
>
> . . . .
>
> . . . .  Why did it wait so long to inform Plaintiff that it failed to meet the requirements?  Did it see that Plaintiff was in the competitive range and then try to trump up reasons to remove it?  Did this same bunch of procurement officials know that Orion was going to win the Fort Hood award and try to find ways "to defund" Orion?  Did they ignore the cold facts in the Orion spreadsheets, superior past performance and excellent technical merit?  Did they search for some

Accordingly, assuming that plaintiff had standing to protest, the court would deny plaintiff's first claim for relief.

### B.  Reinstatement to the Competition After the Issuance of Amendment 7

With respect to plaintiff's other main contention–that the Army should have reinstated plaintiff to the competition after issuing Amendment 7–defendant again argues that plaintiff lacks standing.  The court agrees.

---

specious basis to keep Orion from its place in the "sweet spot" in the competitive range?  Did they then hold the "hammer of retaliation" over Orion's head?

Id. at 6-8.

Plaintiff further contends that the federal procurement process is designed to prevent small businesses from succeeding, despite this procurement being completely set aside for small businesses:

Unfortunately, the federal procurement process is not simply the application of proven facts to applicable law.  The players in this game know only too well the "real way sausage is made in the factory".  A defendant will often consider the risk of a small firm challenging "the system".  Tactics such as "trench warfare", "bleed them dry", "drive them into BK" lurk behind every protest against a federal procurement officer.  Moreover, they don't have to pay for legal counsel.  They are guaranteed the very best legal talent in the country–the United States Department of Justice–free of charge and with a plethora of presumptions and burdens in their favor.  Seemingly clever devices, such as erasing the protestor's best evidence by manipulating the formats and reducing fonts so small that the Court is deprived of proper examination, are par for the course.

Id. at 6-7; see also id. at 14 ("[Procurement officials] have the best lawyers in the country for free; they have all burdens and presumptions in their favor and a small, minority-owned business hemorrhaging financially from the earlier unilateral 'insourcing' action.  It is just a matter of time before Orion 'cries Uncle'.").

The court cannot countenance any of these suggestions, allegations, or arguments.  None finds support in the administrative record, and plaintiff has not offered any evidence that would lend them credence.  Far from being a victim of the Army's procurement process, plaintiff is solely responsible for its predicament, due to its failure to submit a proposal by the proposal due date that contained all of its teaming partners' cost/price data.  No other entity can shoulder the responsibility for plaintiff's neglect.

Plaintiff was excluded from the competition after an initial screening of proposals for noncompliance with the solicitation's requirements.  After plaintiff's disqualification, the Army evaluated the remaining proposals and determined that discussions were necessary.  The Army accordingly issued Amendment 7 to inform offerors of its intent to hold discussions with those offerors in the competitive range.  Thus, when the Army issued Amendment 7, plaintiff was no longer in the competition.

As the court noted above, to demonstrate a direct economic interest, a protester in a preaward bid protest must either show that it had a substantial chance of receiving the contract or that it sustained a nontrivial competitive injury that could be addressed by judicial relief.  Plaintiff has not, and cannot, make either showing with respect to the Army's refusal to reinstate its proposal.  The Army excluded plaintiff from the competition prior to evaluating proposals, something it was entitled to do pursuant to the terms of the solicitation.  Because plaintiff's proposal was excluded from the competition prior to initial proposal evaluations, plaintiff had no chance, much less a substantial chance, of receiving a contract at any time thereafter.  Nor could any action (or inaction) by the Army taken (or not taken) after plaintiff's disqualification harm plaintiff.  Moreover, the court is unable to provide the relief plaintiff requests.  For the court to reinstate plaintiff to the competition at the discussions stage, it would have to find that the Army should not have disqualified plaintiff during its initial screening of proposals and that plaintiff's proposal belonged in the competitive range.  The Army, however, properly disqualified plaintiff from the competition, which necessarily precludes the court from directing the Army to reevaluate plaintiff's proposal.  And, the court lacks the authority to evaluate proposals in the first instance–that is the Army's responsibility.  Because plaintiff cannot establish a direct economic interest in the competition subsequent to its disqualification, plaintiff lacks standing to seek reinstatement to the competition.  The court therefore need not address the merits of plaintiff's second and third claims for relief and it finds no utility in doing so.

### III.  CONCLUSION

For the reasons set forth above, the court **GRANTS** defendant's motion to dismiss, **FINDS AS MOOT** defendant's motion for judgment on the administrative record, and **DENIES** plaintiff's motion for judgment on the administrative record.  Because plaintiff has not succeeded on the merits of any its claims, it is not entitled to injunctive relief.  No costs.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine proposed redactions agreeable to all parties.  Then, by **no later than Friday, December 16, 2011**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

Further, plaintiff has not yet filed redacted versions of any of the documents it filed under seal, as required by paragraphs 6 and 7 of the protective order entered on September 12, 2011.

Plaintiff shall file redacted versions of its sealed documents, conferring with defendant or defendant-intervenor as necessary, **no later than Friday, December 16, 2011**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge